# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

FABIAN URIATE-SOTO, and
EVA ROMAN, individually and
as parent and next friend of
JOSE ROMAN and
MARIA ROMAN, minors,

      Plaintiffs,

      v.                                  No. 11cv1075- WJ/SMV

JERROD C. PELOT,
MATTHEW A. REEDER,
DAVID M. TAYLOR, and
DANIEL A. BROKAW,
in their individual capacities,

      Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

THIS MATTER comes before the Court upon Defendants' Motion for Partial Summary Judgment to Dismiss Counts I, III, IV and V (in part) of Plaintiffs' Amended Complaint, filed December 21, 2012 (**Doc. 38**). Having reviewed the parties' briefs and applicable law, I find that Defendants' motion is DENIED AS MOOT with regard to dismissal of separate Fourteenth Amendment claims; DENIED with regard to Counts I, IV and V; and GRANTED with regard to Count III asserted by the Roman Plaintiffs.

## BACKGROUND

This is a civil rights lawsuit, seeking recovery under both state and federal law. The matter arose from the unlawful search, seizure, and assault of Plaintiff Fabian Uriate-Soto by Albuquerque Police Department officers Jerrod Pelot and Matthew Reeder. Additionally,

Plaintiffs Eva Roman, Jose Roman, and Maria Roman claim that they were unlawfully searched and seized by Defendants during, or incident to, Defendants' seizure and assault of Mr. Uriate-Soto. Plaintiffs Jose Roman and Maria Roman are minors, who are being represented in this matter by their mother, Plaintiff Eva Roman. Defendants were, at all relevant times, law enforcement officers employed by the Albuquerque Police Department ("APD"), a governmental agency operated by the City of Albuquerque. Defendants Taylor and Brokaw, also APD officers, were dismissed from the lawsuit when Plaintiffs amended their complaint. *See* Doc. 40 and 38-8.

The Amended Complaint (Doc. 40) alleges the following:

- Count I: Unlawful Seizure, asserted by Plaintiff Uriate-Soto under the Fourth and Fourteenth Amendments against Defendants Pelot and Reeder ("Defendants");

- Count II: Excessive Use of Force, asserted by Plaintiff Uriate-Soto under the Fourth and Fourteenth Amendments against Defendants;

- Count III: Unlawful Seizure asserted by Eva Roman, Jose Roman and Maria Roman ("Roman Plaintiffs") against all Defendants;

- Count IV: unlawful search of plaintiffs' residence in violation of Plaintiffs' 4th & 14th Am rights against all Defendants; and

- Count V: State Tort claims asserted by all Plaintiffs for battery, false imprisonment, and violation of property rights, including trespass, against Defendants.

Defendants seeks to dismiss Plaintiffs' Fourteenth Amendment claims alleged in Counts I, II, III and IV. They also seek dismissal Counts I, III, IV and V (in part).

## I.   Legal Standard

Police officers are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This is an objective standard and requires no inquiry into the officers' state of mind. *Id*. To defeat the defense of

qualified immunity, a plaintiff must prove (1) that the defendant violated a constitutional or statutory right, and (2) that this right was clearly established at the time of the defendant's conduct.  *McBeth v. Himes*, 598 F.3d 708, 716 (10th Cir. 2010) (internal quotation marks omitted).  If a plaintiff meets this burden, then a third inquiry is presented: whether defendant has satisfied the usual summary judgment standard of showing that no material facts are in dispute and that he or she is entitled to judgment as a matter of law.  *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).

Summary judgment is only appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c); Martinez v. Beggs, 563 F.3d 1082, 1088 (10th Cir. 2009).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case.  Once that burden is met, the nonmoving party must put forth specific facts showing that there is a genuine issue of material fact for trial; it may not rest on mere allegations or denials in its own pleadings.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57 (1986).  In order to avoid summary judgment, the nonmoving party must put forth enough evidence that a reasonable jury could return a verdict in the nonmovant's favor.  *Id*. at 249.  A mere scintilla of evidence in the nonmovant's favor is not sufficient. *Id*. at 252.  Analysis of a summary judgment motion requires that the court consider all the evidence in the light most favorable to the nonmoving party.  *Trask v. Franco*, 446 F.3d 1036, 1043 (10th Cir. 2006).

## II.    Undisputed Facts[1]

---

[1]   The facts as set forth here are supported by exhibits attached to the pleadings.  For ease of reading, the Court does not refer to these exhibits except where necessary, since the bulk of the factual evidence is presented in the form of depositions or affidavits.  Also, Plaintiffs' exhibits are numbered, while Defendants' exhibits are listed by letter.

The events in this case began with began with a "suspicious person" call from a woman who lived at 1327 Corriz, Southwest, Albuquerque, N.M.   Ex. 3 at 34:16.   APD Officers Reeder and Pelot, the only remaining Defendants in this case, were dispatched to the call around 7:00 a.m.   The caller later explained that a male had knocked on her door looking for work.   She had engaged him in conversation, and at some point thought the encounter was over and closed the door.   The male continued to knock, hung out in her yard and made her feel uncomfortable, and so she called the police to remove the man from her property.   The caller described the male as Hispanic and wearing a blue baseball hat, black tank top and blue jeans.   Ex. 3 at 23:16-22; 35:5-12; & 34-35.   There is some disagreement over the exact nature of the dispatch call in that Plaintiff contends that the "CAD entry" for the call (the pleadings contain no explanation for the meaning of the acronym) did not state that the caller had asked the suspect to leave or that she was concerned for her safety.   The call is described as a non-priority call, but it is unknown what priority was assigned to the call.   *See* Ex. 1 at 30:14-25.

A.   <u>Initial Encounter</u>

There are two versions of Defendants' initial encounter with Plaintiff Uriate-Soto. According to Defendants, when Officer Reeder pulled up his vehicle to the caller's residence, he saw a male matching the description standing in the yard and looking straight at his police vehicle.   Defendant Reeder was wearing his uniform and displaying his badge of office.   As Defendant Reeder exited his vehicle, he told the male "Come here."   Instead of coming towards Defendant Reeder, the male started walking away.   As Plaintiff started walking away, Defendant Pelot drove his marked police car around to the front of the male in an attempt to cut him off. Defendants claim that as Defendant Pelot opened the door to his vehicle, the male took off running.   Defendant Reeder told him "Police, Stop," and Defendant Pelot also told him to stop.

4

As Defendants ran after the male, he ran in front of the garage to a residence located at the 1335 Corriz residence, then turned a corner which lead to the front door of that house.   At that point, the officers lost sight of him so the officers drew their weapons and proceeded cautiously around the corner to guard against being ambushed by the male.

Plaintiff Uriate-Soto,[2] who was later identified as the male in question, testified that he had left the neighbor's property when asked to do so.  He admits that he knew police were in the area, and he ran into the house located at 1335 Corriz (which turned out to be Plaintiff's residence) as Defendant Pelot's patrol car drew closer to him.  Plaintiff claims that he was already walking up the driveway to his residence when the officers arrived on the scene, and had already entered his property before the officers said anything to him.  He ran only the last few steps to the front door of his residence in response to hearing sirens from police vehicles, and not in response to seeing an officer exit a vehicle.  Ex. 5 32:19-22.

B.   Entry into House[3]

The parties also dispute what transpired subsequently, from the time Plaintiff entered his home, until the time Plaintiff was in custody.

1.   *Defendants' version*

Defendants testified that they observed Plaintiff run inside an open front door to the residence and then saw him slam the door shut and heard him lock the door.   Ex. A at 44:21-25; Ex. B at 38:12-39:12, 40:9-14.  Defendants could hear "banging noises coming from inside the house.  Ex. 1 at 45:10-11; Ex. 2 at 39:13-15 (referring to a "commotion, not necessarily like a screaming or yelling, just a noise . . . going on inside the house").   Defendants claim they had

---

[2]   For the facts relating to events up until the Roman Plaintiffs become involved, the Court will refer to Plaintiff Uriate-Soto as "Plaintiff."
[3]   The belt tape submitted by Defendants as Exhibit 13 contains recordings of other calls, as well as recordings of some of the events connected to this case.  The recording of these events starts at about the time the officers entered the house.  Ex. 1 at 13:13-25.

reason to believe that someone was inside the house besides the unidentified male, given that it was about 7:00 in the morning, the door to the residence was wide open before the male entered the home, and given there was a car in front of the residence.  Defendants also contend that, because of the commotion going on inside the house, and other indicators that gave them reason to believe someone else was inside the house, the officers were in fear that the resident occupants could be in danger.   Ex. 1 at 53:9-18 & at 45:10-14 ("We were in fear somebody was potentially in danger inside that residence due to the banging noises.  We couldn't tell exactly what was happening, but we did hear him inside. We were afraid he was going to commit violence against somebody at that residence."); Ex. 2 at 41:5-8 (Officer Pelot believing that danger was "extremely high for us let alone these two young children that are inside the house").

It is undisputed that Defendant Pelot kicked the door to attempt to gain entry, but when the door did not open, Defendant Reeder kicked it and the door flew open.     It is also undisputed that after the door opened, the officers were able to see two children, who were later identified as minor Plaintiffs Jose Roman (age 11) and Maria Roman (age 16) inside the residence, on a couch that inside the doorway.   According to Defendants, because the officers were concerned for the safety of these two minors, the officers told the children to get out of the house.  When they encountered the children, the officers had their firearms still drawn, but they held their weapons in a depressed low-ready position.  They told the children to get out of the house.  Ex.A at 45:24-25; Ex. B at 39:16-21.   Jose and Maria Roman exited the home as instructed and the officers then began to look for Plaintiff Uriate-Soto.  As they were looking, Officer Reeder saw the back sliding glass door was open to the residence and he also heard some banging noises which sounded like they were coming from the north end of the house.   Officer Pelot went around the side of the house, jumped over the fence into the backyard where he saw

the open sliding glass door.   The officers looked in different rooms throughout the residence to search for Plaintiff as well as for other persons who could be hurt or in danger inside of the home.

2.    *Plaintiff's version*

Plaintiff's description of events is quite different.  He disputes the facts presented by Defendants to support their contention that they had a reasonable belief that Plaintiff had broken into the house, and that they had a lawful basis to enter the house without a warrant.

Plaintiff testified that he went to his residence at 1335 Corriz, opened the front door which was closed but not locked when he arrived, went inside without any kind of forced entry and locked the door behind him.  Plaintiff does not dispute the presence of Jose and Maria inside the house; he stated that he saw the children on the sofa when he went inside the house.  Ex. 5 at He told them not to open the door because he heard the police, but did not know if they were coming for him.  Ex. 5 at 36:22-25.  Plaintiff testified that although he heard the police sirens, he did not have a sense that anyone was following him, and did not see a police officer before he entered inside your residence.  Ex. 5 at 39.

Plaintiff disputes the existence of any banging noises sufficient to alert the officers to potential danger inside the house.  Ex. 9, ¶ 3; Ex. 10, ¶ 3 ("no banging or yelling, and not enough noise to indicate a commotion").  He also disputes the existence of a factual basis for the officers' concern for the children's safety.   One child stated that when the officers banged on the front door before kicking it in, they did not identify themselves as police officers.  Ex. 6 at 16:10-23.   Also, according to Plaintiff, the officers pointed their weapons directly at the children and yelled at them to "get the f—k out of the house."  Ex. 6 at 19:15-16; Ex. 7 at 12:14-20.

C.    Encounter with Plaintiff Inside the House

7

What happened after the officers entered the house is also disputed.  Through their deposition statements, Defendants claim that Plaintiff was looking out from a bedroom door, and Reeder gave him commands to show his hands.  Plaintiff did not comply but instead, closed the bedroom door and locked it.   The officers kicked the bedroom door open, and saw Plaintiff going into the bathroom, closing the door and locking it.  The officers warned Plaintiff that he would be tased if he did not comply with their commands.  Defendants state that they heard the toilet flush when Plaintiff was in the bathroom, and when Plaintiff did not come out as instructed, the officers forced their way inside the bathroom.  They attempted to place him into handcuffs, but Plaintiff kept resisting.  He was tased at least three times during the incident (see Ex. A at 48:18-21).

Plaintiff disputes Defendants' statement of facts regarding his conduct.  In his description of events, he could not understand what the officers were saying to him in English because he is a Spanish speaker.  He did understand the officer's command to "Open the door mother f----r."  Ex. 5 at 31:23-32.   Plaintiff also claims that he did not physically resist the officers, and contends that the belt tape "speaks for itself."  Doc. 45 at 6.   Actually, the belt tape offers very little in the way of resolving factual disputes about the events surrounding the officers' entry into the bedroom and bathroom.  It also tends to speak for Defendants as well as Plaintiff on the issue of Plaintiff's comprehension of the English language, because in response to Defendants' commands to exit the bathroom, Plaintiff stated "for what?"  (Belt Tape at 4:48).

It is undisputed that Maria Roman came into the bathroom at some point during the incident, and was told by Defendants to get out.  However, the parties dispute whether there was cause for Defendants to be concerned about Maria's safety, as well as the reason she was

there.   Plaintiff stated that he had summoned "Vicky" (as Maria was allegedly known to Plaintiff) in order to have her interpret from Spanish to English, and to explain to the officers that he was not resisting.  A voice on the belt tape can be heard asking for "Vicki" several times during the period in which it sounds like Plaintiff is being tased.[4]

D.     Facts Involving Roman Plaintiffs

It is undisputed that none of the Roman Plaintiffs (Eva, Maria or Jose) were handcuffed or placed in the back of a police vehicle.[5]  It is also undisputed that Eva Roman did not arrive at the scene until afterwards, when Plaintiff Uriate-Soto had been arrested.  The officers told the children, who were inside the house at the time the officers entered, to exit the residence.   The children stated that the officers yelled at them to "get the f---k out" of the house.  Ex. 6 at 19:15-16; Ex. 7 at 12:14-20.

The officers testified that when they encountered the children, they held their guns in a depressed low-ready position.  Ex.A at 45:24-25; Ex. B at 39:16-21.   The children testified that the officers pointed their guns directly at them, towards their upper bodies while the guns kept moving around. Ex. 6 at 17-18; Ex. 7 at 10-11.   When Maria "Vicky" Roman approached the bathroom where Plaintiff Uriate-Soto was being tased, the officers again yelled at Maria to get out of the house, which she did.

Jose Roman was dressed in nothing but a pair of boxer shorts when he left the house, and was crying.  He testified that he was cold outside but too frightened to go back inside.  Ex. 7 at:10.5-18:8.   Maria was dressed in pajama shorts and a t-shirt.  Ex. 6 at 25:22-26:7.

---

[4]   Defendants are not seeking dismissal of Plaintiff's excessive force claim.  Thus, the facts surrounding the excessive force claim are presented here for context.
[5]   The Court agrees with Defendants that when the belt tape record was turned on does not offer any material or relevant facts.

It is undisputed that Defendants had no contact with Eva Roman before they entered the residence.   It is also undisputed that she was told by one of the other officers who arrived on the scene that she could not go inside the house.  Another officer told her that she could have gotten arrested because she was racing the officers to the house after she had been called by her daughter.   Ex. 8 at 62-63.

## DISCUSSION

Defendants are seeking a dismissal of all claims asserted by Plaintiff Uriate-Soto, except for his claim of excessive force set forth in Count II and battery set forth in Count V.  With respect to the Roman Plaintiffs, Defendants contend that these Plaintiffs were not seized within the meaning of the Fourth Amendment, or in the alternative, that these Plaintiffs, if seized, were legally seized in accordance with the exigent circumstances and/or community care-taker exceptions. Defendants also contend that they are entitled to a dismissal of all Plaintiffs' Unlawful Entry claims (unlawful search in Count IV) because the officers' actions were justified due to exigent circumstances, the hot pursuit doctrine and/or their exercise of their community care-taking functions.

## I.      FOURTEENTH AMENDMENT CLAIMS in I, II, III, and IV

Defendants seek dismissal of Plaintiff's Fourteenth Amendment claims.  They contend that the events complained of concern the validity of the search and seizure under the Fourth Amendment's reasonableness standard, rather than that of the substantive due process clause. *See County of Sacramento v. Lewis,* 523 U.S. 833, 843 (1998) (substantive due process analysis is inappropriate only if it is "covered by" the Fourth Amendment, which covers only "searches and seizures); *Albright v. Oliver,* 510 U.S. 266, 273 (1994) (plurality opinion of Rehnquist, C.J.) ("[w]here a particular Amendment provides an explicit textual source of constitutional protection

against a particular sort of government behavior, that Amendment, not the more generalized

notion of substantive due process, must be the guide for analyzing these claims")  (quoting

*Graham v. Connor*, 490 U.S. 386 (1989)).

There is no need for further analysis of this issue, based on the Plaintiffs' explanation that

they are not pleading a separate, freestanding substantive due process claim.  Rather, Plaintiff's

pleading references the Fourteenth Amendment as the basis to allow claims against state and

local officials.  *See* Doc. 45 at 11, n.2.   Thus, Defendants' motion is denied as MOOT on this

issue.

## II.    Counts I & IV– Unlawful Stop and Seizure; Unlawful Search[6]

Defendants move for dismissal of Counts I and IV (unlawful seizure and unlawful search,

respectively).  While Count I (alleging unlawful seizure) is asserted only by Plaintiff Uriate-

Soto, Count IV (alleging unlawful search) is asserted by all Plaintiffs.  The Court assumes that

the Roman Plaintiffs have standing to assert unlawful search of the house, since it does not

appear to be an issue in dispute. Plaintiffs argue that Officers were legally entitled to enter what

turned out to be Plaintiffs' residence because of the existence of exigent circumstances and the

"hot pursuit" doctrine.  Plaintiff Uriate-Soto contends that there was no justification for entering

and searching the house or for arresting him in his house, without a warrant.

A.    Initial Stop

Police-citizen encounters fall into three categories: (1) consensual encounters which do

not implicate the Fourth Amendment, (2) investigative detentions which are Fourth Amendment

---

[6]   While Count I (alleging unlawful seizure) is asserted only by Plaintiff Uriate-Soto, Count IV (alleging unlawful
search) is asserted by all Plaintiffs.  The Court assumes that the Roman Plaintiffs have standing to assert unlawful
search of the house, since it does not appear to be an issue in dispute.   In this section, the Court addresses only the
seizure of Plaintiff Uriate-Soto, since the Roman Plaintiffs' claim for seizure will be addressed later in the
discussion on Count III.   For this reason, reference to "Plaintiff" in the singular in this section refers to Mr. Uriate-
Soto.

seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity, and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.   *Latta v. Keryte,* 118 F3d 693, 698 (10th Cir. 1997).   Defendants acknowledge that Plaintiff was not "seized" within the meaning of the fourth Amendment until he was already inside his residence at 1335 Corriz.   *See* Doc. 38 at 16. Thus, the officers' actions in allegedly directing Plaintiff to stop or in attempting to seize him, should be analyzed under the Fourth Amendment as an initial stop.

Reasonable suspicion is a less demanding standard than probable cause.   *United States v. Treto-Har*o, 287 F.3d 1000, 1004 (10th Cir.2002) (quotation omitted).   While probable cause means "a fair probability that contraband or evidence of a crime will be found," reasonable suspicion is merely a particularized and objective basis for suspecting criminal activity. *United States v. Sokolow*, 490 U.S. 1, 7  (1989) (quotation omitted).   Whether Defendants had reasonable suspicion to stop and detain Plaintiff initially depends on which version of facts is accurate.   In one version, a male had refused to leave the neighbor's property and the caller was concerned for her safety.   When the officers arrived, the man standing in the neighbor's yard (Plaintiff Uriate-Soto) matched the description of the individual described by the caller and was still in the neighbor's unfenced yard.   When Officer Reeder asked him to "come here," Plaintiff instead started walking away.   He started running when Officer Pelot drove his police car in front of Plaintiff in an attempt to cut him off.

In Plaintiff's version—the one that must be accepted as true by the Court at this point— Plaintiff had voluntarily left the neighbor's property before the police arrived.   He was walking up his own driveway when Defendants arrived.   He did not hear any directive to "stop" or "come here" and started running only in the last few steps to his front door in response to the police

12

sirens.  The disparate versions of events preclude summary judgment on the question of whether

Plaintiff was "refusing to obey" or "eluding" the police under various New Mexico statutes or

City of Albuquerque Ordinances, and thus whether there was reasonable suspicion to stop and

detain him. *See Romero v. Story,* 672 F.3d 880 (10th Cir. 2012) (finding no reasonable suspicion

to stop, and therefore no probable cause to arrest plaintiff for flight).  Because the relevant

material facts on this issue are disputed, the Court cannot conclude as a matter of law that a

reasonable officer could have believed there was reasonable suspicion to stop and attempt to

detain Plaintiff.  For this reason, Defendants are not entitled to qualified immunity on the issue of

the initial stop and attempted detention.

B.      Search of House and Seizure of Plaintiff

        At the time of the alleged incidents, it was clearly established that a police officer cannot

enter and search a home without a warrant and absent exigent circumstances.  *See Cortez v.*

*McCauley*, 478 F.3d 1108, 1124 (10th Cir. 2007) (citing *United States v. Scroger*, 98 F.3d 1256,

1259 (10th Cir.1996)); *United States v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006) (quoting

*Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990)). It was also clearly established that the same

Fourth Amendment protections attaching to the home extend to curtilage. *Lundstrom v. Romero*,

616 F.3d 1108, 1129 (10th Cir. 2010).   In order for exigent circumstances to exist: (1) the

officers must have reasonable grounds to believe that there is an immediate need to protect the

lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable.

*Najar,*  451 F.3d at 718.   Police officers may also enter premises without a warrant when they

are in hot pursuit of a fleeing suspect.  *See United States v. Santana*, 427 U.S. 38, 42-43 (1976).

        Defendants contend that they acted reasonably in arresting Plaintiff because they had

probable cause to believe he had committed a crime.  *See Albright v. Rodriguez et al.*, 51 F.3d

1531,1536 (10th Cir. 1995) (When a warrantless arrest is the subject of a § 1983 action, the defendant arresting officer is entitled to immunity "if a reasonable officer could have believed that probable cause existed to arrest the plaintiff."); *United States v. Watson,* 423 U.S. 411, 422 (1976) (Warrantless public arrests do not violate Fourth Amendment if they are based upon probable cause that the person arrested has committed a crime in the officer's presence). Defendants rely on various state statutes and city ordinances ("refusing to obey" under § 12-2-19 of the City of Albuquerque Code of Ordinances; and "eluding" under NMSA 1978, § 30-22-1).

In this case, exigent circumstances would exist if Plaintiff had broken into a house that was not his and there was reason to believe other persons were inside whose safety was compromised.  Defendants testified that the front door to the house open when Plaintiff ran inside while fleeing, that they heard a "commotion" going on inside the house, and that after kicking in the door, two children were inside on a couch.  However, Plaintiff has presented evidence that he was not fleeing but only walking up his driveway when Defendants first approached him; that the door to his house was closed when he approached, and that there was nothing going on in the house to cause a "banging noise" or "commotion" when Defendants broke down the door.

The analysis does not end with a determination on whether probable cause existed, because it undisputed that Plaintiff was arrested inside his house, and this fact justifies additional inquiry.  *See Aragon v. City of Albuquerque,* 423 Fed.Appx. 790, 2011 WL 1850700 (10th Cir. 2011) (referring to the "special solicitude" the home enjoys under the Fourth Amendment).  For a right to be clearly established, there must be Tenth Circuit or Supreme Court precedent close enough on point to make the unlawfulness of the officers' actions apparent, so that reasonable

officials would have understood that their conduct violated that right.  *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir.2010); *Siegert v. Gilley*, 500 U.S. 226, 232 (1991).

At the time the alleged incidents took place, it was clearly established that an intrusion into the home may be lawful when the officer has both probable cause to effect an arrest and the arrest involves "exigent circumstances" such as a threat to officer safety or the "hot pursuit" of a fleeing suspect.  *United States v. Martin*, 613 F.3d 1295, 1299 (10th Cir.2010) (citing *Georgia v. Randolph*, 547 U.S. 103, 116 n. 6 (2006); *Payton v. New York*, 445 U.S. 573, 588-89, (1980) (Fourth Amendment prohibits warrantless arrest in home, absent exigent circumstances, even if statute authorizes action and probable cause exists); *U.S. v. Reeves,* 524 F.3d 1161, 1169 (10th Cir. 2008) (same); *Howard v. Dickerson,* 34 F.3d 978, 982 (10th Cir. 1994) (police officer denied qualified immunity where state statute authorized warrantless arrest in home where no exigent circumstances existed.  However, the "hot pursuit" exception does not include warrantless arrests for misdemeanors without more "extraordinary circumstances":

> Relevant precedent clearly prohibits police from routinely entering a person's home to effectuate a warrantless arrest (even if the officers have probable cause to believe the person committed a felony), see Payton, 445 U.S. at 576, 100 S.Ct. 1371, and a minor offense does not permit warrantless entry into the home except in the most extraordinary of circumstances.

*Mascorro v. Billings,* 656 F.3d 1198, 1208 (10th Cir. 2011) (citing *Payton v. New York*, 445 U.S. 573, 588-89 (1980) (Fourth Amendment prohibits warrantless arrest in home, absent exigent circumstances, even if statute authorizes action and probable cause exists).  Mascorro  was decided almost a year after the events at issue, but the events in that case occurred in 2007, several years before the events occurred in this case.  The facts in that case are sufficiently analogous to those of the instant case (as alleged by Plaintiff) to conclude that the law was

clearly established such that Defendants would have known their conduct violated Plaintiff's

Fourth Amendment rights:

> The intended arrest was for a traffic misdemeanor committed by a minor, with whom the officer was well acquainted, who had fled into his family home from which there was only one exit.  The risk of flight or escape was somewhere between low and nonexistent. Moreover, there was no evidence which could have potentially been destroyed and there were no officer or public safety concerns. There [was] nothing to indicate the sort of "real immediate and serious consequences" [citing *Welsh v. Wisconsin,* 466 U.S. 740, 751 (1984). The warrantless entry based on hot pursuit was not justified.

656 F.3d at 1207.

*Mascorro* relied on *Welsh v. Wisconsin*, 466 U.S. 740 (1984), which noted that the "nature of the

underlying offense is an important factor to be considered in the exigent-circumstances

calculus."  *Welsh* stated that "it is difficult to conceive of a warrantless home arrest that would

not be unreasonable under the Fourth Amendment when the underlying offense is extremely

minor."  466 U.S. at 751.   The Supreme Court also noted that it had "no occasion to consider

whether the Fourth Amendment may impose an absolute ban on warrantless home arrests for

certain minor offenses."  *Id.* at 749.   Rather, it held that the nature of the underlying offense was

an important consideration when determining the reasonableness of a warrantless entry.  *Id.*  This

means that in this case, the critical inquiry for the fact finder will be whether the surrounding

circumstances in this case were sufficiently exigent to justify a warrantless entry into Plaintiff's

house and his subsequent arrest.

Defendants rely on *Aragon v. City of Albuquerque,* 423 Fed.Appx. 790, 794, 2011 WL

1850700 to bolster their position that a reasonable officer is not precluded by clearly established

law from continuing to pursue a suspect into a home to complete an arrest.   In addition to its

questionable weight as an unpublished case, Aragon's holding is very limited.  *Aragon* involved

a child custody situation, where emotions ran high and the resulting physical confrontations gave

rise to concerns for officer safety. The plaintiff in that case argued that the hot pursuit exception should be limited to fleeing felons, and not apply to arrests for minor offenses.  The court held only that plaintiff had not met his burden of establishing that the law at the time of his arrest (2006) clearly precluded a reasonable officer from relying on the hot pursuit doctrine for misdemeanors.  Defendants cannot rely on *Aragon* to argue that the law was not clearly established at the time because *Aragon's* holding is consistent with clearly established law which does not preclude the hot pursuit exception for minor offenses when exceptional circumstances also exist.

Based on the foregoing, Defendants are not entitled to qualified immunity because the law was clearly established that a minor offense does not permit warrantless entry into the home except in the most extraordinary of circumstances.  Defendants are also not entitled to summary judgment on this issue because there is a dispute of facts concerning the existence of exigent circumstances.  Defendants rely on cases which are inapposite either because the undisputed facts are different or because they present facts which require the Court to view the facts in this case favorably to Defendants.  *U.S. v. Najar,* involved a "911 disconnect" emergency call, where officers did not enter the residence for a half hour while making efforts to confirm or dispel their suspicions about the call.  In *Sanchez v. Ulibarri,* 308 Fed.App. 280, 2009 WL 146468 (10th Cir. 2009), plaintiff was arrested in the doorway of his home while fleeing from the police.  He had forced on-coming traffic onto the shoulder of the road, and had posed a danger to the public, which was then compounded when plaintiff refused to pull-over and attempted to escape into his house.

In the instant case, it is undisputed that the dispatch call responded to by Officers Reeder and Pelot was a "non-priority."  It is also undisputed that the officers did not wait outside the

17

house like the officers did in *Najar*, but kicked the front door in immediately on approaching it. Whether the officers' observations gave rise to a reasonable belief that Plaintiff had broken into the house, and whether exigent circumstances existed to justify the officer's entry into the house and Plaintiff's arrest, depends on which version of events is true. A finding regarding the reasonableness of the officers' actions in entering and searching the house must be deferred to the fact finder to assess the credibility of both Plaintiff and Defendants. *Lamon v. City of Shawnee, Kan*., 972 F.2d 1145, 1159 (10th Cir. 1992) ("It is the jury's exclusive province to assess the credibility of witnesses and determine the weight to be given to their testimony."). For these reasons, Defendants are not entitled to qualified immunity on Count IV alleging unlawful search of the house. Accordingly, Defendants are not entitled to dismissal of Plaintiff's Fourth Amendment claims in Counts I & IV alleging unlawful seizure of Plaintiff Uriate-Soto and unlawful search of the house.

## II.     Count III – Unlawful Seizure Asserted by Roman Plaintiffs

The Roman Plaintiffs ("Plaintiffs" for purposes of this section) contend that the evidence supports a reasonable inference that they were not free to leave, disregard officers' commands, or terminate their encounter with police. In other words, they contend that they were unlawfully seized in violation of their Fourth Amendment rights. A seizure occurs when "a reasonable person would not feel free to leave or disregard the contact." *Lundstrom v. Romero*, 616 F.3d 1108, 1119 10th Cir. 2010); *California v. Hodari D*, 499 U.S. 621, 626 (1991) (a seizure requires either the use of physical force by the police officer or submission by the individual to the police officer's assertion of authority).

A.     Maria and Jose Roman

Viewing the facts favorably to the children, none of those facts suggest that Defendants violated their Fourth Amendment rights protecting them from unlawful seizure.  It is undisputed that the children were told to leave the house.  Whether they were told aggressively or nicely is not material to whether they were seized.  Being told to *leave* a building, even aggressively or unprofessionally,[7] does not constitute being seized under the Fourth Amendment.  Also, viewing the facts favorably to the children, there is no evidence at all that the officers were aiming the guns at the children, or that they used them in a show of force for the purpose of seizing them.  The fact that the officers' aim with their guns may have been at a level with the children's heads and upper chest does not amount to a constitutional violation. The children stated that the guns were constantly moving about, while the officers went through the house in a search toward the area of their mother's bedroom.  Ex. 7 at 12.   This is consistent with Defendants' statements that their guns were at low-ready, placed at the level of their own chests, which would be on line with a child's upper body.

As a matter of law, the Court concludes that no seizure took place in the house or outside. It is undisputed that the children left the house with little clothing.  Jose testified that he was cold outside and did not go back in because he was too frightened, but he was not prevented from going to his mother when she arrived at the scene. Ex. 7 at 17:17-20.   Maria did manage to go back inside the house and was not prevented doing so by the officers.  Ex. 7 at 19. Unfortunately, these discomforts are not prohibited by the Fourth Amendment.  Plaintiffs Maria and Jose Roman do not present any evidence which would suggest that their Fourth Amendment

---

[7] While it is a disputed  issue of fact concerning the manner in which the children were told to leave the residence, if the officers in fact told the children to "get the f___ out of the house" as the children claim, such language used by certified law enforcement officers in the presence of children is clearly unprofessional and constitutes conduct unbecoming an officer of the APD.  Nevertheless, whether or not the officers used foul language in the presence of children does not alter the Court's view that a seizure within the meaning of the Fourth Amendment did not occur with respect to the Roman Plaintiffs.

rights were violated.  For this reason, the Court finds that Defendants are entitled to summary judgment on Count III asserted by Maria and Jose Roman.

B.      Eva Roman

Eva Roman arrived on the scene after the children were already sent outside by Defendants.  She testified that one officer told her she could not go inside, and another told her she could have been arrested because she was racing the officers to the scene.  Neither officer is a Defendant in this case.  However, as Plaintiff points out, this does not insulate Defendants from liability.  Defendants Reeder and Pelot could be viewed as "setting in motion" a series of events which they knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights.  *Trask v. Franco*, 446 F.3d 1036, 1046 (10th Cir.2006) (internal quotation marks omitted); *Martinez v. Carson*,  697 F.3d 1252, 1255 (10th Cir. 1012).  However, Eva Roman's claims still do not withstand summary judgment because no reasonable fact finder could conclude that the actions of those officers deprived her of her Fourth Amendment rights.

The Court cannot fathom how being told not to enter the house in those circumstances constitutes seizure under the Fourth Amendment, any more than an individual who is told not to enter a crime scene area is being "seized" under the Fourth Amendment.  No officer told Ms. Roman to *leave*; she was told not to *enter* the house.   Ms. Roman stated that she was not sure whether she was supposed to stay put where she was, or stay by the car. Ex. 8 at 66.   This is not a response which constitutes a Fourth Amendment submission to police authority in the context of a "seizure."  Moreover, no reasonable juror would find that it was unreasonable to keep Ms. Roman outside the house while officers were still inside with Mr. Uriate-Soto.  Ex. 8 at 73-76.   Similarly, no reasonable juror would find that Ms. Roman's Fourth Amendment rights

were violated when another officer told her that she *could have* gotten arrested.  Ms. Roman was *not* arrested, nor was she even threatened with arrest.

Plaintiffs also contend that they were detained (assuming a seizure took place, which the Court finds did not occur) for a "prolonged period."  It is not clear whether the Roman Plaintiffs assert an unlawful detention as well as unlawful seizure.  The only evidence addressing this issue presented by Plaintiffs is Ms. Roman's statements that the time period which elapsed between the time that Ms. Roman first encountered the police until she went inside to get clothes for her son was between 15 and 30 minutes.  Ex. 8 at 71.    Because Plaintiffs were not seized, these facts do not constitute a detention.  In addition, these "facts" do not give rise to an unlawful detention claim because they were not in fact detained, but at most were kept from going back *inside* the house where an arrest had just been completed.   Accordingly, Defendants are entitled to summary judgment on Count III as to Eva Roman, Maria Roman and Jose Roman.

### III.    Count V – State Tort Claims

Plaintiffs assert claims of battery, false imprisonment, and violation of property rights, including trespass, under the New Mexico Tort Claims Act against Defendants.   Defendants seek dismissal on all of these claims except for battery on the ground that Defendants' conduct was lawful.  Such a finding is premature.  The Court has denied summary judgment because the material facts are in dispute.  These same facts would apply to Plaintiffs' state law tort claims as well.  Because the Court cannot conclude as a matter of law that Defendants' conduct was lawful, Defendants are not entitled to summary judgment on Plaintiffs' state law tort claims.

### CONCLUSION

In  sum, the Court dismisses as moot Defendants' motion seeking dismissal of separate Fourteenth Amendment claims.

The Court finds and concludes that Defendants are not entitled to qualified immunity on Plaintiff's Fourth Amendment claims in Counts I and IV because the law was clearly established at the time.  Additionally, Defendants are not entitled to summary judgment on these claims because there are genuine material facts in dispute which require resolution by a fact finder.

The Court also finds and concludes that a ruling on Plaintiffs' state law tort claims in Count V would be premature, given the existence of disputed facts.  Thus, summary judgment is denied with regard to Count V.

Considering that the relevant law was clearly established at the time of the underlying incidents, The Court finds and concludes as a matter of law that Eva Roman, Maria Roman and Jose Roman (the "Roman Plaintiffs") were not unlawfully seized in violation of their Fourth Amendment rights.  No reasonable juror could find, viewing the facts favorably to these Plaintiffs, that Defendants Reeder and Pelot unlawfully seized or attempted to detain any of them.

As a result of the Court's rulings herein, this case shall proceed to trial on Counts I, II, IV and V.[8]

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Partial Summary Judgment to Dismiss Counts I, III, IV and V (in part) of Plaintiffs' Amended Complaint (**Doc. 38**) is hereby DENIED AS MOOT with regard to dismissal of separate Fourteenth Amendment claims;

**IT IS FURTHER ORDERED** that the motion is DENIED with regard to Counts I, IV and V;

**IT IS FINALLY ORDERED** that the motion is GRANTED with regard to Count III asserted by the Roman Plaintiffs.

---

[8]  Defendants' motion did not seek dismissal of Count II.

_____

UNITED STATES DISTRICT JUDGE